## Trach v. Thrift Drug Inc.

C.P. of Lehigh County, no. 97-C-1535.

*John P. Karoly Jr.,* for plaintiff.
*Alan K. Cotler,* for defendant.

BLACK, *J.,* May 16, 2000—Defendant, Thrift Drug Inc., dispensed the wrong medication to plaintiff, Allen Trach, allegedly causing him serious physical problems, including glaucoma of his right eye and cognitive difficulties. A jury trial resulted in a verdict of $5 million in favor of Trach. Before the court is Thrift Drug's motion for post-trial relief under Pa.R.C.P. 227.1, seeking a judgment n.o.v. in its favor, or in the alternative, a new trial.

At the trial, Thrift Drug admitted dispensing Doxepin, a tricyclic antidepressant drug, to Trach instead of the antibiotic prescribed by his dentist. Thrift Drug offered no explanation for this error, and we therefore directed a verdict in favor of Trach on the issue of Thrift Drug's negligence. In response to special interrogatories, the jury found that Thrift Drug's negligence had caused harm to Trach, and that the amount of money required to compensate Trach for his injuries is $5 million. A molded

verdict in this amount was then ordered against Thrift Drug in favor of Trach.[1]

In its post-trial motion, Thrift Drug contends that the testimony of Trach's expert witness, Dr. John J. Shane, that the Doxepin mistakenly dispensed to Trach caused him substantial harm, was inadmissible as a matter of law. According to Thrift Drug, Dr. Shane's testimony must be disregarded in toto. Since this was Trach's only evidence on the issue of causation, Thrift Drug argues that judgment n.o.v. should be entered in its favor. Alternatively, Thrift Drug seeks a new trial on the ground that Shane's expert opinions were improperly admitted into evidence, or that the verdict was excessive in amount as a result of an improper closing argument by Trach's counsel. For the reasons set forth below, we deny the motion for judgment n.o.v. and grant a new trial as to damages only.

## I. THE FACTS

On July 11, 1995, because of pain in his jaw, Trach went to see his family dentist, Dr. Lentz. After examining Trach, Dr. Lentz suspected some type of infection and therefore prescribed an antibiotic, Amoxil, sometimes referred to as Amoxicillin. Trach took the prescription to a Thrift Drug pharmacy, where it was partially filled the same day. Unfortunately, instead of giving Trach the prescribed medication, Amoxil, the pharmacist's assistant on duty filled the prescription with Doxepin. Although

---

1. At the close of Trach's case, a compulsory nonsuit was granted in favor of the co-defendant, J. Fellin. Mr. Fellin is no longer involved in this case.

the prescription called for 40 capsules of 250 milligrams of Amoxil, Trach received instead 29 capsules of 150 milligrams of Doxepin. Trach was told that the pharmacy had only 29 capsules of Amoxil in stock and that he should return in a few days to pick up the rest of his prescription for 40 capsules.

Trach's prescription called for two pills to be taken every four hours. He took his first two pills after dinner on July 11. Within an hour or so, he began having strange sensations, including shakiness, dizziness, confusion and headaches. He felt so badly that he had to lie down. When he received a telephone call later in the evening, he had difficulty walking to the telephone and did not feel that he was speaking coherently. After the telephone call, he returned to bed and slept for awhile until his wife awakened him at 11 or 11:30 p.m. to take two more pills. About 1 a.m., he experienced nausea, vomiting, pain in his right eye, difficulty walking, an intoxicated feeling, and a rapid heartbeat. He felt as if he were going to die.

The next day, Wednesday, July 12, Trach did not go to work because he felt so poorly. Instead, he slept most of the day. He awakened only to take his pills; he took two capsules early in the morning, another two capsules at noon, and another two capsules around 3 or 4 o'clock in the afternoon. He continued to experience the same symptoms. Toward the end of the day, Trach's wife called Dr. Lentz to report her husband's symptoms. Dr. Lentz told her that he did not believe the medication was causing the symptoms, but that Trach should nevertheless stop taking the pills as a precaution. Acting on Dr. Lentz's advice, Trach stopped the medication. At that point, he

had taken only 10 of the 29 pills over a period of two days.

On Thursday, July 13, Trach again did not go to work. He visited South Side Family Medicine, a clinic, where a physician's assistant, Jeffrey Trexler, saw him. At this time, Trach continued to feel dizzy and lightheaded. Vision in his right eye was slightly blurred. He also noted a yellow-orange, crescent-shaped object in his right eye that partially obscured his field of vision.

On Friday, July 14, Trach did report to work. However, he could not focus on his job and ended up sleeping most of the day at his desk. That night after work, his throat began to feel sore. Consequently, he resumed taking the pills.

The following day, Saturday, July 15, he cut down on his dosage, taking either one pill every four hours or spacing out his doses over periods greater than four hours. Nevertheless, the symptoms he had originally experienced after taking the pills persisted. Moreover, on Sunday, July 16, Trach began to experience occasional hallucinations in addition to his other symptoms. Because of this, he stopped taking the pills. Up to that point, he had taken 23 of the 29 pills. On Monday, July 17, Trach revisited the physician's assistant, Jeffrey Trexler, at South Side Family Medicine. Trexler ordered blood work and an MRI.

Trach did not take any pills on July 17 or July 18. However, on July 18, he returned to Thrift Drug to pick up the remaining 11 pills that were part of the initial prescription. When he brought these pills home, his wife noticed that they were different from the six pills that remained from his initial supply. She immediately called

Thrift Drug and questioned the pharmacist, James Fellin, about this. After investigating the matter, Fellin told Mrs. Trach that her husband had been given the wrong medication, Doxepin. Fellin then informed Trexler at South Side Family Medicine what had happened, and Trexler directed Trach to go to Sacred Heart Hospital for some additional tests.

Most of Trach's symptoms disappeared within a month. However, his vision problems and some cognitive problems have remained. The cognitive problems include difficulty concentrating and an inability to think clearly or to accomplish simple tasks.

On August 4, 1995, approximately three weeks after he first ingested the Doxepin, Trach visited Dr. Mark Moran, an ophthalmologist, regarding his eye problems. Dr. Moran at first was unable to make a definitive diagnosis. However, by March 1996, after consultation with various specialists, Dr. Moran concurred in a diagnosis of glaucoma in Trach's right eye. Dr. Moran described this as "chronic open-angle glaucoma or even more specifically, pigmentary glaucoma."[2] Trach also has continued to have a crescent-shaped blind spot, known as an arcuate scotoma, in his right eye as a result of optic nerve damage from the glaucoma.

Laser surgery was attempted on Trach in March 1999, to relieve the intraocular pressure in his right eye. However, this surgery could not be completed because of the extreme pain it caused Trach. Trach's vision problems, according to Dr. Moran, are permanent.

_____

2. N.T. 6/17/99 at 116.

Trach has continued working at the same job he held in July 1995, installing and servicing closed-circuit telephone systems for Protect Alarms, an Allentown company. He lost 15 days of work as a result of problems from the ingestion of Doxepin. More significantly, he has been forced to make adjustments in the way he does his work and is concerned about his ability to retain his job.

Trach has difficulty reading because of his vision problems. These problems also limit his ability to pursue his lifelong hobbies of photography and hunting.

The recommended dosage of Doxepin is 75 milligrams, while the maximum allowable dosage for an individual per day is 300 milligrams. Since each of the capsules provided Trach contained 150 milligrams, whenever he took two capsules, as he usually did, he substantially exceeded the recommended dosage. He also consumed far more than the maximum allowable daily dosage on most of the days he took the medication.

## II. THE EXPERT OPINIONS

### A. *Dr. John J. Shane*[3]

Trach called as an expert witness John J. Shane M.D., a physician who is board certified in clinical and anatomical pathology and in toxicology. Dr. Shane is chairman of the Department of Pathology at Lehigh Valley Hospital and is also director of Health Network Laboratories. As a pathologist and toxicologist, Dr. Shane deals with the effects of drugs and chemicals on patients and

---

3. N.T. 6/16/99 at 168-251.

how these relate to the patients' symptoms. He does not regularly treat patients himself. However, he consults with the clinical staff to determine if the symptoms that patients present with are consistent with the type and quantity of drugs in their systems. He has instructed neurologists in neuropathology and ophthalmologists in ocular pathology.

Dr. Shane was Trach's only expert witness on the issue of causation. He never personally examined Trach. Instead, he relied on the medical records of Trach's treating physicians, such as Dr. Moran, for a diagnosis of Trach's condition.

Dr. Shane testified as follows: Doxepin is a tricyclic antidepressant that has been on the market for about 20 years. It is not in common use anymore because more effective antidepressants have been developed. Doxepin works by blocking the amine pump that transmits nerve impulses across synapses, the junction points at which nerve cells hook up with each other. The transmission of nerve impulses across synapses depends on an intact chemical environment. Doxepin interferes with this environment by blocking the transmission of the chemical acetylcholine. This blocking action is known as an anticholinergic effect.

There may be adverse reactions or side effects from even a therapeutic dose of Doxepin. There are also contraindications for Doxepin, *i.e.,* symptoms or conditions that may be exacerbated by the drug. The known side effects and contraindications have been determined through clinical trials prior to approval of the drug by the Federal Food and Drug Administration and also from clinical experience since the drug has been on the mar-

ket. The side effects and contraindications for a therapeutic dose of Doxepin are identified in the manufacturer's package insert and in the Physician's Desk Reference. The manufacturer's insert is included with each package of a drug that has been approved for marketing by the FDA. The PDR is a compilation of drugs that are available for the treatment of patients. It is considered authoritative and is relied on regularly by physicians in prescribing drugs to patients. Both the manufacturer's package insert and the PDR contain product information about the drug, including its chemical composition, the mechanism of action, recommended and maximum dosages, adverse reactions or side effects, and contraindications.

The symptoms experienced by Trach after ingesting Doxepin are consistent with the adverse reactions identified in the manufacturer's package insert and in the PDR. These adverse reactions or side effects included ataxia (unsteadiness on his feet), dizziness, blurred vision and disorientation. Such side effects can occur from a therapeutic dose of Doxepin. The amount of this drug ingested by Trach through Thrift Drug's mistake was far in excess of the maximum allowable dosage set forth in the manufacturer's insert and the PDR. Thus, it is understandable that the Doxepin had an especially severe effect on Trach.

Glaucoma is a condition of increased ocular pressure in the eye that causes pathologic change to the eye. It may result in damage to the optic nerve that is irreversible, and in some cases leads to loss of vision. Both the manufacturer's insert and the PDR state that Doxepin is contraindicated for glaucoma. This is for two reasons.

First, the anticholinergic effect of Doxepin causes the pupils of the eye to dilate unequally, a condition known as mydriasis. Second, the anticholinergic effect also causes the ciliary muscle of the eye to become inactive, a condition referred to as cycloplegia. The ciliary muscle is what alters the configuration of the lens of the eye to accommodate for changes in the distance of objects. When the ciliary muscle is inactive, the shape of the lens of the eye does not change to accommodate for distance changes.

The combination of mydriasis and cycloplegia leads to blurred vision. It also leads to changes in the eye, specifically a blockage of the Canal of Schlemm, a circulatory channel between the front chamber and back chamber of the eye. The result is increased pressure in the eye. In addition, the dilation of the iris, the colored part of the eye, causes pigmentary loss. The pigment is deposited in the filter system at the Canal of Schlemm, further clogging up the filter and also causing increased pressure in the eye.

This combination of mydriasis and cycloplegia is a mechanism that leads to narrow-angle glaucoma, sometimes referred to as closed-angle glaucoma. However, the distinctions between narrow- or closed-angle glaucoma and open-angle glaucoma are often confused in the medical profession. Consequently, some authorities have recommended that the nomenclature be changed to eliminate the distinction.

Trach's medical records indicate that he has glaucoma in his right eye and that this has led to functional abnormalities from optic nerve damage caused by the glaucoma. The functional abnormalities include an arcuate

scotoma, an arc-shaped area of central vision loss. In this arc-shaped area of his field of vision, Trach cannot see anything. This condition was caused by optic nerve damage from the glaucoma in his right eye. It is an irreversible condition.

To a reasonable degree of toxicological certainty, all the symptoms Trach complained of following his ingestion of Doxepin and those that he continues to complain of are the direct result of the overdose of Doxepin. These symptoms include the glaucoma and scotoma in his right eye as well as the various neurological and cognitive side effects.

The causal connection between Trach's ingestion of Doxepin and his glaucoma is clear from two factors. These are (1) the timing of the glaucoma shortly after his ingestion of Doxepin and (2) the known anticholinergic effect of Doxepin that can cause excessive dilatation of the pupil of the eye.

The continuing cognitive problems exhibited by Trach, including confusion, poor memory, inability to concentrate and the like, are also causally related to his ingestion of Doxepin. The causal connection follows from the fact that these problems first developed immediately after his ingestion of Doxepin and are recognized adverse reactions to Doxepin according to the manufacturer's insert and the PDR. The ingestion of Doxepin caused a permanent alteration of Trach's brain chemistry, so that the cognitive difficulties he continues to experience are permanent. The neurological tests administered to Trach after the Doxepin cleared his system revealed no objective neurological deficits. The negativity of these tests supports the conclusion that his continuing cognitive problems are related to his earlier ingestion of Doxepin.

## B. *Dr. Mark E. Moran*[4]

Trach also called as a trial witness Mark E. Moran D.O., an ophthalmologist who has been treating Trach for his eye problems. Dr. Moran did not offer an opinion on the issue of causation. He initially saw Trach on August 4, 1995, a few weeks after his ingestion of Doxepin. At first, Dr. Moran did not diagnose Trach's condition as glaucoma. However, after a number of consultations, by March of 1996, he concurred with a diagnosis of "chronic open-angle glaucoma and even more specifically, pigmentary glaucoma." [5] Dr. Moran stated that Trach's glaucoma is a permanent condition.

## C. *Dr. Michael A. Naidoff*[6]

Thrift Drug presented the videotaped deposition of Michael A. Naidoff M.D., a board-certified ophthalmologist, who regularly treats glaucoma patients. Dr. Naidoff had never examined Trach. He testified that, based on his review of Trach's medical records, Trach had open-angle glaucoma or pigmentary glaucoma, a form of open-angle glaucoma. According to Dr. Naidoff, Trach did not have closed-angle or narrow-angle glaucoma. In open-angle glaucoma, there is no physical obstruction within the eye that impedes the flow of fluid; there is a blockage instead in the wall of the eye. Closed-angle or narrow-angle glaucoma, on the other hand, is characterized by a physical obstruction within the eye, causing fluid to

---

4. N.T. 6/17/99 at 114-48.

5. N.T. 6/17/99 at 116.

6. Deposition of Michael A. Naidoff M.D., 6/8/99, defendant's trial exhibit 4.

build up, and the angle of the eye, where the fluid drains out, to close. Dr. Naidoff opined that although Doxepin can cause closed-angle or narrow-angle glaucoma, there is nothing in the medical literature to support the proposition that it can cause open-angle glaucoma, such as Trach developed. Dr. Naidoff testified that the cause of open-angle glaucoma is not known.[7]

### D. *Dr. Richard I. Katz*[8]

Thrift Drug also presented the testimony of Richard I. Katz M.D., a board-certified neurologist. Dr. Katz also had never examined Trach, and based his testimony on Trach's medical records. According to Dr. Katz, these records reveal no objective signs of continuing neurological damage, and indicate that Trach is neurologically normal. Dr. Katz denied that Doxepin permanently alters the brain's chemistry. He opined that the only cognitive difficulties experienced by Trach from the Doxepin were temporary and would have subsided within a month after he stopped taking the drug. Dr. Katz stated that there is nothing in the medical literature to support the proposition that Doxepin is the cause of continuing cognitive difficulties for Trach.

## III. THE OBJECTIONS TO DR. SHANE'S TESTIMONY

Thrift Drug asserts two objections to Dr. Shane's testimony in its motion for post-trial relief. First, Thrift Drug argues that because Dr. Shane is not an ophthalmologist

---

7. *Id.* at 17.
8. N.T. 6/16/99 at 252-315.

or neurologist, he was not qualified to render an expert opinion on the cause of eye or neurological conditions. Second, Thrift Drug contends that Dr. Shane's conclusions do not meet the *Frye* test of general acceptance in the relevant scientific community.

## A. *Dr. Shane's Qualifications*

The new Pennsylvania Rules of Evidence, effective October 1, 1998, apply to this case. Rule 702, pertaining to testimony by experts, provides:

"If scientific, technical or other specialized knowledge beyond that possessed by a layperson will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise."

According to the comment by the Pennsylvania Supreme Court's Ad Hoc Committee on Evidence, Rule 702 does not change the law of Pennsylvania on expert witnesses. The court must still make an initial determination whether the subject matter requires expert evidence to aid the jury's understanding, and, if so, whether the proffered expert has at least a reasonable pretension to special knowledge, skill, experience, training or education in that field. See *Dambacher by Dambacher v. Mallis,* 336 Pa. Super. 22, 36-37, 485 A.2d 408, 415 (1984), *appeal dismissed,* 508 Pa. 643, 500 A.2d 428 (1985).

At trial, we rejected Thrift Drug's objection to Dr. Shane's qualifications, and we continue to see no merit to this challenge. The test of an expert's qualifications

has always been a liberal one. In *Miller v. Brass Rail Tavern Inc.,* 541 Pa. 474, 480-81, 664 A.2d 525, 528 (1995), the Supreme Court stated:

"The test to be applied when qualifying [a witness to testify as] an expert witness is whether the witness has *any* reasonable pretension to specialized knowledge on the subject under investigation. If he does, he may testify and the weight to be given to such testimony is for the trier of fact to determine." (emphasis in original) See also, *Bennett v. Graham,* 552 Pa. 205, 714 A.2d 393 (1998).

Dr. Shane, a board-certified pathologist and toxicologist, clearly has more than a reasonable pretension to specialized knowledge on the subject matter under investigation, *i.e.,* the effect of an overdose of Doxepin on an individual. Dr. Shane not only has a medical degree, but one of his fields of specialization is toxicology, which deals with the effect of toxic substances on the human body. As a board-certified pathologist and medical toxicologist, he has instructed neurologists in neuropathology and ophthalmologists in ocular pathology. Although he does not see patients on a regular basis, he does consult regularly with clinical staff to correlate patients' symptoms with the types and quantity of drugs in their systems.

Thrift Drug complains that only an ophthalmologist can testify as to the effects of Doxepin on the eyes, and only a neurologist can testify as to the effect of Doxepin on one's nervous system. This is not, however, what Rule 702 or the Pennsylvania case law says. It is well established in Pennsylvania that a physician may testify as an expert in a field outside his or her specialty. See *e.g.,*

*Poleri v. Salkind,* 453 Pa. Super. 159, 683 A.2d 649 (1996) (orthopedic surgeon qualified to give opinion concerning physiatrist's care of plaintiff's wound); *Chanthavong v. Tran,* 452 Pa. Super. 378, 682 A.2d 334 (1996) (general practitioner qualified to testify concerning condition and treatment of spine; radiologist qualified to testify concerning pain and suffering caused by herniated disk); *Commonwealth v. Browdie,* 439 Pa. Super. 642, 654 A.2d 1159 (1995), *aff'd on other grounds,* 543 Pa. 337, 671 A.2d 668 (1996) (pediatrician qualified to testify concerning cause of death); *Commonwealth v. Berrena,* 421 Pa. Super. 247, 617 A.2d 1278 (1992) (psychiatrist qualified to testify to effects of ingesting certain substances); *Kearns v. Clark,* 343 Pa. Super. 30, 493 A.2d 1358 (1985) (urologist competent to testify about performance of hysterectomy by a gynecologist); *PennDOT v. Moss,* 146 Pa. Commw. 330, 605 A.2d 1279 (1992) (toxicologist without medical degree competent to testify about effect of drug on person). Moreover, Dr. Shane has specific expertise and experience in analyzing the relationship between a patient's symptoms and the drugs in the patient's system. Therefore, Thrift Drug's objection to Dr. Shane's qualifications as an expert witness is unfounded and was properly denied at trial.

## B. *The* Frye *Test*

There is a special rule, known as the *Frye* rule, that governs the admissibility of expert opinions on scientific matters. The rule originated in a 1923 federal court decision, *Frye v. United States,* 54 App.D.C. 46, 293 F. 1013 (1923), and was adopted by the Pennsylvania Supreme Court in 1977 in *Commonwealth v. Topa,* 471 Pa.

223, 369 A.2d 1277 (1977). Under the *Frye* rule, "expert evidence on scientific matters must pass through an additional hoop." *Blum v. Merrell Dow Pharmaceuticals Inc.*, 705 A.2d 1314, 1317 (Pa. Super. 1997), *allocatur granted*, 558 Pa. 597, 735 A.2d 1267 (1999). To be admissible at trial, the opinions proffered or the methodologies used to reach these opinions must be generally accepted in the relevant scientific community. *Id.* The purpose of this rule is to avoid "junk science" being presented to the jury. The trial court is to act as a gatekeeper to determine whether the proffered scientific evidence meets this "generally accepted" standard.

The *Frye* rule has since been superseded in the federal courts by the less restrictive *Daubert* rule[9] established by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Despite considerable support for the *Daubert* rule in many jurisdictions, the Pennsylvania appellate courts still follow the *Frye* rule. See *Commonwealth v. Arroyo*, 555 Pa. 125, 142 n.10, 723 A.2d 162, 170 n.10 (1999).

The new Pennsylvania Rules of Evidence do not themselves refer to the *Frye* decision or to the notion that scientific evidence must be generally accepted in the rel-

---

9. Under the *Daubert* rule, the admissibility of scientific evidence does not require proof of general acceptance in the relevant scientific community. Instead, the trial judge makes "a preliminary assessment whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts at issue." *Daubert*, 509 U.S. at 592-93, 113 S.Ct. at 2796. General acceptance in the scientific community is only one of the factors to be considered by the court in making this assessment.

evant scientific community to be admissible. However, the committee's comment to Rule 702 notes:

"Adoption of Pa.R.E. 702 does not alter Pennsylvania's adoption of the standard in *Frye* . . . , which requires scientific evidence to have 'general acceptance' in the relevant scientific community."

This is consistent with the principle that the new rules of evidence were not intended to modify existing case law.

## 1. The Waiver Argument

In the instant case, Thrift Drug filed a motion in limine approximately a month prior to the commencement of trial, seeking to preclude the testimony of Dr. Shane on the ground that his conclusions were not based on "accepted scientific or medical literature" and therefore did not meet the *Frye* test.[10] Dr. Shane's expert report dated June 16, 1997, acknowledged that a careful search of the literature had revealed "no references on which we can place reliance in predicting the effects of these drugs in massive overdosages. The precise mechanism of action of Doxepin is not known, regardless of the dosage."[11]

However, the manufacturer's package insert for Doxepin and the PDR confirmed that most of the symptoms reported by Trach were adverse reactions to a therapeutic dose of the drug. Therefore, we denied the mo-

---

10. Defendant's motion in limine to preclude testimony of plaintiff's expert, ¶7.

11. Report letter of Dr. John J. Shane 6/16/97 at 2, defendant's motion in limine to preclude testimony of plaintiff's expert, exhibit "A."

tion in limine and refused to preclude Dr. Shane's testimony.[12]

At trial, Thrift Drug did not raise the *Frye* issue during Dr. Shane's testimony. At the conclusion of all the evidence in the case, Thrift Drug moved to strike his testimony in its entirety on the ground that it did not meet the "general acceptance" requirement of *Frye*. This motion to strike was denied.

Trach contends that the motion to strike was untimely and that Thrift Drug's failure to interpose a *Frye* objection during Dr. Shane's trial testimony constituted a waiver of this issue. However, under Pa.R.E. 103(a)(1), where a litigant challenges a ruling admitting evidence, the issue is preserved if there has been "a timely objection, motion to strike *or motion in limine* stating the specific ground of objection." (emphasis added) The comment to Rule 103 clearly states:

"A ruling on a motion in limine on the record is sufficient to preserve the issue for appeal, without renewal of the objection or offer at trial."

Since Thrift Drug's motion in limine specifically raised the *Frye* rule as the basis for precluding Dr. Shane's testimony, this motion preserved the *Frye* issue for post-trial consideration.

## 2. The Scope of the *Frye* Rule

Trach next contends that the *Frye* test applies only to "scientific advances that produce new types of evidence." *Commonwealth v. Crews,* 536 Pa. 508, 517, 640 A.2d 395, 399 (1994). Therefore, according to Trach, Dr.

---

12. Order 6/15/99.

Shane's testimony did not have to pass the *Frye* test because his opinions were based on long-established scientific principles and did not constitute a new type of evidence.

It is true that *Frye* itself and the Pennsylvania Supreme Court decisions applying *Frye* have all been based on new types of scientific evidence. In *Frye* the court excluded evidence of a lie detector test based upon measured changes in systolic blood pressure, on the ground that the relevant scientific community did not generally accept the validity of such a test. In *Commonwealth v. Topa, supra,* our Supreme Court, for the same reason, excluded spectrogram voiceprint evidence to identify the defendant as the person who made a recorded telephone call. See also, *Commonwealth v. Blasioli,* 552 Pa. 149, 713 A.2d 1117 (1998) (admitting DNA evidence); *Commonwealth v. Crews, supra* (allowing testimony as to the results of DNA testing, but excluding the statistical analysis for lack of agreement in the scientific community); *Commonwealth v. Dunkle,* 529 Pa. 168, 602 A.2d 830 (1992) (excluding testimony of a "child sexual abuse syndrome" for want of general acceptance in the field of psychology); and *Commonwealth v. Nazarovitch,* 496 Pa. 97, 436 A.2d 170 (1981) (excluding hypnotically refreshed testimony as lacking general acceptance in the relevant scientific community).

Nevertheless, in recent cases, Pennsylvania's intermediate appellate courts have taken a broader view of *Frye*.[13]

---

13. For a critical view of these cases, see Cuker, Mark R., "Caselaw out of 'Wack': Part I and Part II," 23 PLW 253 (February 28, 2000) and 23 PLW 279 (March 6, 2000). The author contends that the Superior and Commonwealth Court decisions since 1996 have usurped the

Thus, in *Wack v. Farmland Industries Inc.,* 744 A.2d 265 (Pa. Super. 1999), the Superior Court excluded the testimony of plaintiffs' causation expert that wife-plaintiff's cancer was caused by her exposure to benzene from defendant's oil tanks. The court held that the causal connection between benzene and the specific type of cancer that wife-plaintiff contracted was not generally accepted in the scientific community. The court found inapplicable the studies relied on by plaintiffs' experts supporting a general causal connection between exposure to petroleum products and other forms of cancer.

Other recent decisions have applied *Frye* to reach similar results. In *Blum v. Merrell Dow Pharmaceuticals Inc., supra,* the Superior Court excluded expert evidence linking the drug Bendectin with a birth defect, clubfeet, on the ground that neither the causal connection nor the methodology used by plaintiffs' chief expert met the *Frye* test of general acceptance in the scientific community. In *McKenzie v. Westinghouse Electric Corp.,* 674 A.2d 1167 (Pa. Commw. 1996), *appeal denied,* 547 Pa. 733, 689 A.2d 237 (1997), the Commonwealth Court invoked the *Frye* rule in rejecting expert evidence that chemicals in contaminated drinking water were the cause of a birth defect. See also, *Wimberly v. Wyeth Laboratories Inc.,* 48 Leh. L.J. 47 (1998) (rejecting expert testimony of a causal connection between Norplant, a birth control drug implanted under the skin, and plaintiff's stroke because the expert did not establish that such a

---

jury's function by improperly using *Frye* to exclude evidence of medical causation from qualified experts.

causal connection was generally accepted in the scientific community).

The Supreme Court has granted allocatur in the *Blum* case,[14] and we are hopeful that the court, will use this occasion to clarify the rules for expert testimony in Pennsylvania. However, unless and until the Supreme Court overrules or qualifies *Blum* and the other intermediate appellate court decisions to the same effect, we are required to follow these decisions and to apply the *Frye* test to all expert testimony in matters of science, whether or not the testimony involves a novel type of scientific evidence.

### 3. Application of the *Frye* Rule

According to *Blum,* there are "two ways to analyze the question of whether the causation testimony proffered . . . meets the *Frye/Topa* standard. One focuses on whether the causal relationship is generally accepted by the scientific community, and the other on whether the methodology is generally accepted by the scientific community." *Blum,* 705 A.2d at 1322.

It is not completely clear from *Blum* whether the proffered expert evidence must satisfy both methods of analysis or whether either is sufficient. We think the better view is that expert evidence of causation should be admissible if it passes muster under either analysis. How-

---

14. Allocatur was granted in January 1999. The Supreme Court heard argument last October, but has not yet handed down its decision. Although we would have preferred to have the benefit of this decision, we do not know when this decision will be forthcoming, and we believe we should not delay any longer in deciding the case now before us.

ever, in the instant case, as in *Blum,* we reach the same result with respect to Dr. Shane's testimony regardless of the mode of analysis.

Dr. Shane's opinions fall into three categories: (1) that the ingestion of Doxepin by Trach caused the neurological and cognitive difficulties and blurred vision that he experienced shortly afterwards; (2) that Trach's cognitive difficulties are permanent; and (3) that the ingestion of Doxepin caused Trach's glaucoma and the resulting scotoma. With respect to the initial adverse reactions, Dr. Shane cited both the manufacturer's package insert and the PDR as support for his opinion. We find that these publications do establish general acceptance in the scientific community of the side effects of Doxepin. Included among these side effects are the very symptoms experienced by Trach shortly after ingesting Doxepin, such as shakiness, dizziness, confusion and blurred vision. Since these are recognized adverse reactions from a *therapeutic* dose of Doxepin, there is ample support for Dr. Shane's opinion that the substantial overdose of Doxepin ingested by Trach was the cause of his neurological and cognitive difficulties and the blurred vision he experienced shortly after ingesting the drug. Therefore, Shane's opinion to this effect was properly admitted into evidence at the trial.

However, with regard to the other opinions of Dr. Shane, we reach a different conclusion. Trach did not establish the general acceptance in the medical community of a causal connection between the ingestion of Doxepin and either permanent cognitive difficulties or open-angle glaucoma. Although Dr. Shane himself testified that his opinions on these matters were based on

widely accepted scientific principles, he failed to offer sufficient evidence of this. As the Superior Court stated in *Blum:*

"Testimony by a qualified expert 'doesn't become "scientific knowledge" just because it's uttered by a scientist; nor can an expert's self-serving assertion that his conclusions were "derived by the scientific method" be deemed conclusive.' " *Blum,* 705 A.2d at 1323 (quoting *Daubert,* 43 F.3d at 1315-16).

In this case, Dr. Shane did not produce or identify any specific medical literature or any scientific studies that support his opinions on permanent cognitive difficulties or glaucoma. In his report letter of June 16, 1997, he acknowledged that he could find nothing in the medical literature on the effect of an overdose of Doxepin.

When asked at trial whether there was any support in the medical literature for his opinions, Dr. Shane gave this response:

"Oh, absolutely. Every opinion I have given today is supported very definitely in the medical literature. It's supported in things that are available on every physician's desk like the Physician's Desk Reference. It's supported in the medical literature by the various textbooks. It is supported in the medical literature by the textbook on toxicology written by Randall Bassault. It's supported by other textbooks. Ellenhorn will support what I have said. I said nothing today to this jury that isn't supported by medical literature.

"What's not in the medical literature is how does it block that distal end of the synapse? We don't know. And we don't have a lot of history on massive overdoses because the drug has been out of favor sufficiently long

that folks have not overdosed. It has not been a popular—it has not been an available or a popular street drug." [15]

Dr. Shane's reliance on the PDR as support for his opinions on permanent cognitive difficulties and glaucoma is obviously misplaced. The PDR, though certainly an authoritative publication, does *not* state that Doxepin causes a permanent change in a person's brain chemistry or that it leads to permanent cognitive difficulties or glaucoma.

The references in the PDR to neurological and cognitive adverse reactions do not indicate whether these conditions are permanent or temporary. Since Trach has the burden of proof on this issue, he cannot rely on the ambiguity of the PDR to prove his point. The PDR is not evidence of a scientific consensus that Doxepin can cause permanent cognitive difficulties.

Nor does the PDR assert a causal link between Doxepin and glaucoma. The PDR does refer to glaucoma as "contraindicated" for Doxepin. This does not mean, however, that Doxepin *causes* glaucoma, but only that a person who already has glaucoma should not take Doxepin. Significantly, the PDR does not identify glaucoma as an adverse reaction or side effect of Doxepin. Therefore, the PDR is not evidence of general acceptance in the medical community that Doxepin causes glaucoma.

The PDR, of course, refers to adverse reactions and contraindications of a *therapeutic* dose of Doxepin. In this case, Trach ingested a substantial overdose. It is possible that a large overdose could be a cause of glau-

---

15. N.T. 6/16/99 at 220-21.

coma. The fact that glaucoma is identified as a contra-indication suggests a possible biological relationship. However, it is impossible to infer from the PDR that the scientific community generally accepts the proposition that an overdose of Doxepin can cause glaucoma.

Dr. Shane's reference to textbooks by Randall Bassault and Ellenhorn is also insufficient to support his conclusions. The textbooks were not produced, and we do not know their exact titles. Nor were any specific page references given. We have no way of knowing from the evidence presented exactly what these books say about Doxepin and its effects. It is also noteworthy that Dr. Shane's reference to these textbooks immediately follows his assertion that the PDR supports his opinions at issue. Since we have seen that the PDR does *not* support these opinions, we cannot assume, sight unseen, that these textbooks do either.

The testimony of the other expert witnesses contradicts the claim that Dr. Shane's opinions on permanent cognitive difficulties and glaucoma are generally accepted in the medical community. Dr. Katz, a board-certified neurologist, testified that there is nothing in the medical literature to support a causal connection between the ingestion of Doxepin and permanent cognitive difficulties. According to Dr. Katz, there is no scientific basis for one to conclude that Doxepin causes a permanent alteration of one's brain chemistry. In his opinion, as soon as the Doxepin had worked its way through Trach's system, a period of perhaps a month, any neurological or cognitive problems relating to the Doxepin, such as those referred in the PDR and the manufacturer's package insert, should have ceased. Similarly, Dr. Naidoff, a board-

certified ophthalmologist, testified that there is nothing in the medical literature to support a causal link between Doxepin and open-angle glaucoma. According to Dr. Naidoff, there is no consensus in the medical community as to the cause of open-angle glaucoma.

There was evidence that Trach's visual problems occurred for the first time shortly after his ingestion of Doxepin. However, under the law, a temporal connection is not legally sufficient to prove causation. Post hoc, ergo propter hoc[16] is a well-known logical fallacy. If Trach's glaucoma had first appeared shortly after an automobile accident, we could not automatically conclude that the automobile accident had caused his glaucoma. Under the *Frye* rule as elucidated in *Blum,* proof of legal causation requires an expert opinion that sets forth a conclusion or uses a methodology generally accepted in the relevant scientific community. In this case, whether we focus on Dr. Shane's ultimate conclusion about the cause of Trach's glaucoma or on the methodology by which this conclusion was arrived at, we can discern no evidence of general acceptance in the medical community.

Some courts have suggested that a particularly strong temporal relationship between an event and a medical condition may lessen the requirement for expert evidence of causation. For example, in *Cavallo v. Star Enterprise,* 892 F. Supp. 756, 774 (E.D. Va. 1995), *aff'd in relevant part,* 100 F.3d 1150, 1159 (4th Cir. 1996), *cert. denied,* 522 U.S. 1044 (1998), the United States District Court for the Eastern District of Virginia wrote:

---

16. After this, therefore because of this.

"Also worth emphasizing is that the circumstances of each case are unique, and the absence of scientific validation through published studies and tested hypotheses is not always fatal to an expert's opinion. Specifically, there may be instances where the temporal connection between exposure to a given chemical and subsequent injury is so compelling as to dispense with the need for reliance on standard methods of toxicology. Thus, if a person were doused with chemical X and immediately thereafter developed symptom Y, the need for published literature showing a correlation between the two may be lessened. Similarly, statistical evidence can be persuasive in certain contexts. For instance, if a known chemical is accidentally introduced into a company's ventilation system, and all of the workers exposed immediately develop the same adverse reaction, then the episode itself may be sufficiently indicative of causation."

However, in the federal courts, the *Daubert* rule prevails. Under *Daubert,* general acceptance in the relevant scientific community is not required; it is only one of the factors to be considered in determining the admissibility of expert evidence. The case now before us is governed by the *Frye* rule, which does require proof of general acceptance in the relevant scientific community.

This case is quite different from *Matthews v. Clarion Hospital,* 742 A.2d 1111 (Pa. Super. 1999), where the plaintiff fell off an operating table and fractured her arm. There the court did not require any expert evidence on causation. However, this was not merely because of the immediacy of the injury, but also because it is a matter of common knowledge that a person falling from a significant height onto a hard surface can break a bone.

Unlike the situation in *Matthews, supra,* the cause of glaucoma is not a matter of common knowledge. As we have noted above, according to Dr. Naidoff, even the medical community does not agree on the cause of open-angle glaucoma. Moreover, the temporal relationship between Trach's ingestion of Doxepin and his contraction of glaucoma is unclear. Dr. Moran did not diagnose Trach with glaucoma when he first examined him in August 1995. It was not until the following March that the diagnosis of glaucoma was made.

In *McKenzie,* the Commonwealth Court indicated that the expert's conclusion on causation must itself be generally accepted in the relevant scientific community. In *Blum,* the Superior Court suggested that a second type of analysis should also be considered, *i.e.,* "whether the methodology underlying the proffered expert testimony is generally accepted by the scientific community." *Blum,* 705 A.2d at 1323. We indicated above that an expert opinion that withstands this second type of analysis should be admissible. Otherwise a plaintiff with a legitimate claim may be denied relief if his claim arises from an unusual occurrence that has not been the result of definitive scientific studies. For example, in this case, Trach ingested a massive overdose of Doxepin. This is not the kind of experience that is likely to have been the subject of scientific study because it happens so rarely. None of the witnesses was able to refer to any epidemiological studies finding either an association or a lack of association between the ingestion of an overdose of Doxepin and glaucoma. Nor can the hypothesis of a linkage be tested by the usual scientific method of controlled studies because, as Trach's counsel has stated:

"No one, with the exception of perhaps Dr. Mengele or other Nazi physician, would ever consider providing to any human being or group thereof the amount of Doxepin ingested by the plaintiff here." [17]

For this reason, we have not considered as fatal to Trach's case the absence of medical literature or published studies reaching the *conclusions* espoused by Dr. Shane. However, without such literature or studies, we must pay special attention to his reasoning process, or "the methodology underlying the proffered expert testimony" to determine whether it is generally accepted by the scientific community. Here, we find that Dr. Shane's testimony is lacking.

The difficulty is that Dr. Shane's reasoning process is inconsistent with the diagnosis of open-angle glaucoma. Dr. Shane explained the mechanism by which Doxepin caused Trach's glaucoma as follows:

"The combination of both, the cycloplegia and the mydriasis leads to the blurred vision. But what it also leads to is changes in the eye. It leads to a closed angle— it leads to a blockage of the Canal of Schlemm, S-C-H-L-E-M-M, which is a circulatory channel between the front chamber and the back chamber of your eye. And it leads to increased pressure in the eye.

"Secondarily, with that iris of your eye, iris is the colored part of your eye that opens and closes with varying amounts of light. When you go into a dark room your pupils are largest because the iris is opened. It has dilated. The profound dilatation of that iris causes pigmen-

---

17. Plaintiff's brief in opposition to defendant's motion for post-trial relief at 41.

tary loss, loss of pigment. That pigment is deposited in the filter system at the Canal of Schlemm. So it clogs up the filter again leading by another mechanism to increased pressure in the eye." [18]

This explanation, however, which is based upon a presumed blockage of the Canal of Schlemm, applies only to *closed-angle* or *narrow-angle* glaucoma. Dr. Moran, Trach's treating ophthalmologist, diagnosed him as having *open-angle* glaucoma, where there is no obstruction impeding the flow of fluid within the eye. The mechanism proposed by Dr. Shane does not explain how Trach developed open-angle glaucoma. Since Dr. Moran was called as a witness by Trach and was the only expert witness who actually examined him, Dr. Moran's diagnosis of open-angle glaucoma must be given credence. Thus, it cannot be said that Dr. Shane's reasoning process as to the cause of Trach's glaucoma or the methodology on which his opinion is based is supported by a general consensus of the medical community.

Dr. Shane attempted to gloss over the inconsistency in his explanation by stating that the distinction between open-end glaucoma and closed- or narrow-angle glaucoma is no longer considered important. However, Dr. Shane failed to demonstrate a consensus of the medical community on this point. Dr. Moran used the term "open-angle glaucoma" in his diagnosis. Dr. Naidoff explicitly rejected the notion that there is no difference between narrow-angle and open-angle glaucoma. Even Dr.

18. N.T. 6/16/99 at 197-98.

Shane's report letter treats "narrow-angle glaucoma" as a relevant term, when he states:

"Doxepin is . . . clearly described as an agent that may have adverse effect in terms of the causation of *narrow-angle* glaucoma."[19] (emphasis added)

Therefore, Dr. Shane's claim that there is no significant difference between the various forms of glaucoma does not itself meet the *Frye* test. Hence it cannot be the basis for an end run around *Frye* on the causation issue.

This case is analogous to *Checchio v. Frankford Hospital-Torresdale Division*, 717 A.2d 1058 (Pa. Super. 1998), where shortly after birth, the minor plaintiff suffered oxygen deprivation, known as hypoxia, due to a respiratory stress syndrome, resulting in brain injury. Two experts, one a pediatric neurologist and the other a neonatalogist, testified for the plaintiffs on the causation issue. The pediatric neurologist stated that, as a result of the hypoxia, the minor plaintiff suffers from mental retardation with behavioral and communication problems. The neonatalogist testified that the hypoxia caused neurological impairment affecting his language and mental function. Both of these experts relied on their own knowledge and experience for their opinions, rather than on any documented scientific authority. The Supreme Court affirmed the trial court's grant of summary judgment for the defendant on the ground that the experts' opinions did not meet the *Frye* test of general acceptance in the scientific community. The proposed testimony of the

19. Report letter of Dr. John J. Shane 6/16/97 at 2, defendant's motion in limine to preclude testimony of plaintiff's expert, exhibit "A."

plaintiffs' experts "scrupulously avoided the medical literature and was based entirely on subjective assessments of both cause and effect." *Checchio,* 717 A.2d at 1062.

Similarly, in the instant case, Dr. Shane did not cite any specific medical literature or studies stating that Doxepin causes either permanent cognitive damage or glaucoma. Dr. Shane's opinions on these issues were based on his own reasoning from general toxicological principles. There is no evidence that any other members of the medical community share his conclusions or concur in his reasoning process.

For the reasons stated, Dr. Shane's opinion that there was a causal connection between Trach's ingestion of Doxepin and the symptoms he experienced shortly afterwards, as described in the PDR and the manufacturer's package insert, was properly submitted to the jury. However, Dr. Shane's opinion that Trach's ingestion of Doxepin caused him permanent cognitive damage as well as glaucoma does not meet the *Frye* test and should not have been submitted to the jury.

Medical science is an evolving discipline, and etiologies that are not generally accepted in the medical community today may well be generally accepted tomorrow. For example, there is now a consensus in the medical community that asbestos causes lung disease. As a result, there are now many meritorious asbestos claims. Twenty years ago these suits would all have been dismissed under the *Frye* rule. Thus, it is quite possible that Trach's overdose of Doxepin may have caused him permanent cognitive difficulties and open-angle glaucoma. Nevertheless, until medical science is able to demonstrate this causal relationship, our courts of law must exercise

restraint. Damage awards are to be based not on speculation, but only on competent proof. Trach may be able to assemble such proof for the retrial of the damage issue. We do not foreclose this possibility. However, our decision on the current motion must be based on the evidence presented at trial. That evidence, as we have seen, falls short. It does not meet the *Frye* test of general acceptance in the relevant scientific community.

## IV. THE MOTION FOR JUDGMENT N.O.V.

Judgment n.o.v. is an extreme remedy that may be granted only in a clear case. See *Lilley v. Johns-Manville Corp.,* 408 Pa. Super. 83, 596 A.2d 203 (1991), *allocatur denied,* 530 Pa. 644, 607 A.2d 254 (1992). The record must be read in a light most favorable to the verdict winner, who is entitled to every favorable inference. A motion for judgment n.o.v. must be denied, unless reading the record even in this most favorable light, there is insufficient competent evidence to support the verdict. See *Vargo v. Koppers Co. Inc.,* 452 Pa. Super. 275, 681 A.2d 815 (1996), *rev'd on other grounds,* 552 Pa. 371, 715 A.2d 423 (1998). Such a motion may not be granted on the basis of testimony presented by the losing party. See *Penn Center House Inc. v. Hoffman,* 520 Pa. 171, 553 A.2d 900 (1989).

In this case, we see no basis for the entry of judgment n.o.v., and Thrift Drug's motion for such relief is denied. Thrift Drug conceded that it gave Trach the wrong medication, and it failed to offer any excuse or explanation for this error. Therefore, we properly directed the jury to find that Thrift Drug was negligent. Trach and his wife

described the symptoms he experienced after ingesting the Doxepin, and Dr. Shane opined to a reasonable degree of medical certainty that these symptoms were caused by the ingestion of Doxepin. To the extent these symptoms are described in the PDR and the manufacturer's package insert as adverse reactions of Doxepin, Dr. Shane's opinion was legally proper. Therefore, there was sufficient evidence for the jury to find, as it did, that Thrift Drug's negligence was a substantial factor in causing harm to Trach. It cannot be said that there was no competent evidence to support a verdict in favor of Trach.

## V. THE MOTION FOR NEW TRIAL

A new trial is to be granted where evidence that affected the outcome of the case was improperly submitted to the jury. See *Atkins v. Pottstown Memorial Medical Center,* 430 Pa. Super. 279, 634 A.2d 258 (1993). Where improperly admitted evidence does not affect the jury's finding of liability, a new trial may be limited to the issue of damages only. See *Mano v. Madden,* 738 A.2d 493 (Pa. Super. 1999).

"A new trial limited to the issue of damages will be granted where: (1) the issue of damages is not 'intertwined' with the issue of liability; and (2) where the issue of liability has been 'fairly determined' or is 'free from doubt.' " *Kiser v. Schulte,* 538 Pa. 219, 233, 648 A.2d 1, 8 (1994).

Because we find that Dr. Shane's opinions on causation with respect to Trach's glaucoma and his continuing cognitive difficulties do not meet the *Frye* test, these opinions should not have been submitted to the jury.

Therefore, reluctant as we are to disturb a jury verdict, under existing appellate court decisions we have no alternative but to grant a new trial. The disputed evidence, however, goes only to the issue of damages; it does not affect Thrift Drug's liability to Trach. Since the damages issue is not intertwined with the issue of liability, and the liability issue has been fairly determined and is free from doubt, the new trial will be limited to the issue of damages only.

In view of our decision to grant a new trial on damages, we do not reach the other issues raised by Thrift Drug in its post-trial motion. We do note, though, regarding the closing argument of Trach's counsel, that Thrift Drug asserted only one objection to this argument at trial, and that objection was sustained. Therefore, any other objections to the closing argument have been waived.

## ORDER

Now, May 16, 2000, upon consideration of defendant's motion for post-trial relief, after review of the briefs submitted by the parties and after oral argument, for the reasons set forth in the accompanying opinion, it is ordered as follows:

(1) Defendant's motion for judgment n.o.v. is denied.

(2) Defendant's motion for new trial is granted as to the issue of damages only. In all other respects the motion for new trial is denied.